The next case is Ethicon Endosurgery vs. Covadine, if that's the proper pronunciation, uh, 2014-13-70. Mr. Kavanaugh. Thank you, Your Honor. In each of the three issues, Ethicon is raised on appeal. The District Court erred by resolving disputed issues of fact rather than properly identifying such disputes which would necessitate a trial. Let me start with the issue of indefiniteness on the 501 patent. The District Court granted summary judgment based on finding the claims indefinite because there were supposedly two ambiguities. What the distance should be between the blade and the clamp when force should be measured and where the length and where along the length of the clamping arm the force measurement should be made. What the District Court failed to recognize is that the specifications squarely answered that first question, what the distance should be between the blade and the clamp when force should be measured. And that, in turn, would inform a person of ordinary skill in the art where along the length of the clamping arm the force measurement should be made. Let me start with the distance point. The specification says that the pressures discussed in the patent are when the entire clamping arm is in contact with the tissue. It then goes on to define the clamping surface area as where the blade and the tissue pad are in close proximity and the clamping arm is in a closed position. So that tells you that there's no angle you're dealing with. You're dealing with they're in close proximity. Once you know that, that answers the distance question. Once you've answered the distance question, you now know that you have a generally linear surface and that the midpoint and the claim says you're trying to determine the average. So with a generally linear surface, well some of the claims, some of the claims, but let me deal with the average claims first and then I'll turn to the other claims. The claim calls, claim 17, claim 1 call for an average. The midpoint is an appropriate point at which to measure the average. That's what our expert did. Our expert went on to confirm. Are there other points besides the midpoint that are also appropriate places to measure the average pressure? Our expert looked at the first and did it at one-third and two-thirds. Is the answer yes? Yes, there may well be. But what the district court and what Covidien did, they never did measurements when it was in a closed position. I guess I'm trying to understand why is there such a focus on the midpoint of the clamping arm as being the magical place to measure the average pressure. When, you know, I guess in this conversation, we appear to be agreeing that you could really measure pressure from any location on the arm for what the applied force is. You could, if you're trying to determine the average, the midpoint is certainly an appropriate place. What does average mean? Average means if you look at the entire surface area, you take the force, and then you divide it by the entire surface area, and that gives you the average. Well, but that gives you the average over the entire arm of the clamping arm. But it seemed to me that the focus of the patent is on that area of the clamping surface, that tiny piece of real estate at the very end of the arm, which is contacting the blood vessel. That's where the rubber hits the road, so to speak. I don't think that's correct, Your Honor, because the specification talks about the entire clamping surface area where it's in contact with the tissue. So that occurs along the entire length. I thought the specification was clear, and correct me if I'm wrong, that the clamping surface 24 or 26, right at the end of the clamping arm, figure 2, is where the pressure is, where the clamping occurs against the blood vessel. Is that right? Right. The clamping occurs. There's a blade, and there's a tissue pad. Right. The pivot arm comes down and closes it. The tissue runs along that entire clamping surface area, and that's why you're looking at the blade. It's about half an inch. The blade comes down on the tissue pad and cuts the tissue. Well, here's what makes me uncomfortable with the midpoint argument, besides the fact that it shows up nowhere in the spec and only in your expert's report. If you look at the language of the patent that tells us that there's a force between, I think it's 2 and 7 pounds at the point of where the clamping surface is, and that you have a surface area on the clamping surface of .033 square inches, I think it is, that produces, by the arithmetic, exactly the pressure that you recite of 60 to 210, right? Yes. Right. So isn't that, isn't the patent telling us that's where you measure, do the respective measurements, and where you achieve, and that's how you achieve the pressure between 60 and 210? Well, you are, we're not saying- You understand what I'm saying? I think I do. Well, it's pretty simple. I mean, you've got a piece of real estate here, the clamping- Surface area. When you put the clamping surface down against the bottom of the clamp- Of the blade. Of the blade, what you're getting, according to the specification, is pressure between 2 and 7 pounds against a surface area right there of .033 square inches, which translates to 60 to 210 pounds per square inch. Yes. So far, so good. Why isn't that, then, what the patent is telling us about where to measure and how you determine whether the pressure is, in fact, between 60 and 210? And if you take the midpoint, that is what you get. That's an appropriate area of, that is an appropriate point at which to do the measurement. You could take, as our expert did, our expert took a measurement at one-third and two-thirds along the length of the entire clamping surface and came up with the same number. But you're going to have a different force at those different points, I would assume, that would produce a different force to produce the same pressure. The differences are so minimal because it is a generally linear, it is generally linear. So the deviation is going to be minimal. And that's why it calls for, it calls for an average. Now, all the testing that Covidian did, they always did it in an open position. They didn't do what the specification calls for. That's why they were getting deviations. They never said that our midpoint was not an appropriate average. They never challenged the fact that our expert took it at one-third and two-thirds and came up with the same number. That's fine. Right now, I think we're more concerned about trying to understand what the claim means. I mean, the claim talks about an average predetermined clamping pressure between and including 60 PSI and 10 PSI on tissue disposed between the tissue pad and the blade. So following up on Judge Bryson's question, it seems like that's the action. The action of the claim is focused on the tissue, the portion of the tissue that is disposed between the tissue pad and the blade, and telling us that the pressure at that precise location has to be between 60 PSI and 210 PSI. Is that a correct reading of the claim? That is a correct reading. Okay, but then now you're saying the force at that end of the clamping arm, that measurement of the force at the end of the clamping arm, would have to be different than the measurement of the force at the midpoint of that same clamping arm. Am I wrong with that? There will be a slight difference, but it is because you're dealing with a generally linear surface at this point, because it's not open. It's closed. It will be generally linear, and the midpoint will give you an average, just as taking it from one-third and two-thirds, putting that together, will give you an average. That's the average of the pressure that the tissue is experiencing all the way along the arm. And this claim is talking about the pressure on the specific part of the tissue that is between the tissue pad at the very end of the arm and the blade. No, the tissue pad runs along, Your Honor. The tissue pad is not on the very end of the clamping arm, as illustrated in the figure? No, it runs along the clamping surface area. The clamping surface area constitutes the blade and the tissue pad. The tissue goes between it. Well, where's the tissue pad on your fingers? It runs from here to here. All the way down? Look at figure two. The tissue pad is 24, at least in the figure. That's just a tiny portion of the entire clamping arm. I'm reading this figure as being the same way that Judge Chen is, I think, which is 24 and 26, clamping surface, are just a small piece at the end of the clamping arm. Contrary to what you were saying. That's a fair point. Okay, go ahead. But the clamping surface area is that area defined by 26. That's what it's trying to get at. It's a very small piece at the end of the clamping arm, which is what I've been trying to explore with you. You're resisting that, which I don't understand. The entire clamping surface area is that tissue pad area. That's what they're talking about. I'm sorry, Ron, I must have misunderstood you. But that is... To cut to the chase, if the measurement is done at the clamping surface area, then it seems to me your indefiniteness problem goes away. I don't understand why you're making this argument about the midpoint. Because you've got elements in the patent that show us that if you measure at the clamping surface, you end up with the right... The combination of force and pressure comes out right. Yes, and Your Honor... Yes, but then you run away from that and say, no, no, no, you have to measure the midpoint. And I don't understand your argument. I'm taking the midpoint. My colleague can correct me if I'm wrong, but the midpoint was taken along where the tissue pad was. The tissue pad and the clamping surface area... In that case, the drawing is very misleading, because the tissue pad in the drawing is nowhere near the midpoint. Would you agree with me? Along the entire clamping arm? Correct. Okay. That is correct. What does midpoint mean if it's not the midpoint of the entire clamping arm? It's the midpoint of the clamping surface area. And the area is the tissue pad and the blade when they are in close proximity to one another. So are we talking about the midpoint of 26? Yes. That is what the expert did. All right. Well, it's not the midpoint of the arm 22? No. He took the midpoint of 26, the tissue pad, because that is the clamping surface area. Speaking of indefiniteness... But when it says, it says the clamping surface area and the tissue pad, and the tissue pad are in close proximity. That's the language from... If you go to column 4, line 25, as previously mentioned, a clamping surface area is the area where the blade and the tissue pad are in close proximity, when the clamping arm is in a closed position. Right. And you're not teaching us anything. We knew that already. The question... But what you are teaching us, apparently, is that we weren't... That your Dr. Schaefer was not talking about the midpoint of the clamping arm. He was talking about the midpoint of the tissue pad. Yes.  I apologize. I apologize if I wasn't clear. Can you point me to something that clarifies that, whether it's in his expert report or somewhere else? It is in his expert report where he did it, because he showed figures where he did it. And I will find a site. Well, 4366 of the appendix is the paragraph in the middle of that page, I guess. It's the one place where he refers to the midpoint. He says the midpoint represents the average along the clamping surface, by which I guess he means the tissue pad. Is that right? Yes, because the patent refers to the... At least that's your understanding of what he's saying. Yes. By clamping surface area, that's what he was referring to. All right. And I apologize if I wasn't clear on that point. I see that my time has elapsed, and I'll save my three minutes for rebuttal. Well, you've used the three minutes, but we will give them back to you. Thank you, Your Honor. Mr. Winteringham. Thank you, Your Honors. May it please the Court. I want to make three general points, but then I think I'll focus on the 501 because that's what we've been focusing on. On the 501, even considering Dr. Schaffer's opinion, which Ethcon says creates at least a question of material fact, the fact remains that the 501 patent simply does not disclose a method for determining the pressure in force. And I'd like to address what Judge Bryson said about taking away the indefiniteness in a minute. As to the design patents, what Ethcon conveniently overlooks in his briefing is at least one major point, and that's that the judge did a side-by-side analysis, even considering the functional elements, and found that there was no infringement. Found them sufficiently distinct that there was no need to consider prior art, and that's found at A135-43. And then at 275, putting aside the claim construction issues, putting aside the allegations of contact, you still, and I'm not saying there's not an answer to that. There is. But they have not shown there's any transverse vibration whatsoever in the sonicision device. What about the droplet test that showed some splattering? The droplet test, which was conducted by our, even though it's their obligation, their burden, was conducted by our expert. The droplet test they don't contest. If there was no splattering, there's no transverse vibration. Every test but one showed no splattering. The test they turned to was a disassembled device that was not secured by O-rings at both ends, so it doesn't represent the actual device as it's sold. There's no support on that. Also, there wasn't a sleeve there, right? Correct. But the point is if the device itself, absent the sleeve, has no transverse vibration, the sleeve isn't needed for damping out the transverse vibrations. But there was no support, so of course the end, this is a very long waveguide. It's about that long. And there's no support at this end, so it doesn't reflect the normal vibration operation of the device. So turning to the 501, first of all, there's more than two aspects that can relate to pressure and force. I just want to say every asserted claim recites specific force or specific pressure. Some of them recite average. Some of them recite average, but they also have a specific force and pressure. So even if the argument was this is how you get average, there's no teaching whatsoever in the patent, and it doesn't teach average. I'll get to that. But it doesn't teach how to measure specific force. It's important to note that the undisputed evidence is that Ms. Noshank, who is one of their inventors, testified there's at least four methods that they use to measure pressure and force. And she couldn't tell which one was used in the patent, and you get disparate results. That in and of itself says what the problem is. If they had put one of those methods into the patent, we wouldn't be here today. But there's simply no method disclosed how you measure the pressure and force. What's unreasonable about thinking of the average pressure as being the midpoint of the tissue pad where the action is occurring? I have some very specific answers to that. The tissue pad, I gather, is quite small. Yes. So you would not expect the pressure to vary that much between one end of the tissue pad and the other. Actually, it does. How much does it vary? Significantly. I can't tell you. It's in the appendix. We have recitations to some of the different measurements. And it actually would take it out of the patent in some cases and in the patent in some cases. In fact, she also tested, both she and Mr. Hauser, who is the other inventor, testified that it depends on where you measure. Ms. Noshank's testimony confirms that force values will vary depending on where along the jaw the measurement is taken. Along the jaw? And we're talking about a tissue pad. Right. That's the only place you measure it. There are two different things. Yes. No, I apologize. I don't want to get bollocked up in that. It's where you measure it along where you're contacting the tissue. So that would be the tissue pad. So are we all on the same page here that all the measurements we're concerned with have to do with just the tissue pad, the clamping surface, not the jaw? Correct. Okay. Now, if you look at the actual device, it's not like the patent where the tissue pad's just at the very, very tip. The jaw of the device is like this. The tissue pad covers most of that open area. Because you're putting tissue into the jaw. And you don't want the surgeon to have to be able to just put it in a little way. So the blade and the jaw are basically the majority of that clamp. So it's – and it varies significantly along that. So you testify to – Like the accused device? Yes. Okay. So maybe that's why in some circumstances we're talking about the midpoint of the arm versus – No, you're still talking – at the midpoint of the tissue pad, right? Right. Because you're saying you've got a tissue pad in your device that runs all the way along the clamping arm. Pretty much every device that is used to cut and coagulate tissue has an opening jaw, which you capture – you push into the tissue and you close. So you want the blade and the tissue pad to pretty much cover that open area. Well, that may be true in all the accused devices, but it doesn't appear to be true, at least in the figure that shows the jaw and the tissue pad in the patent. And therefore, what we're looking at is a question of indefiniteness of the patent, not whether the way that some of the accused devices are structured may make the patent difficult to apply. The question is, if you look at the patent itself, which has a very small tissue pad displayed, why is it not accurate to say – why is it not sufficiently definite to say that the way you measure the pressure is that you take the force and you divide it by the surface area of the tissue pad? And you get – voila – you get 60 to 210 if you take 2 to 7 pounds of pressure over the tissue pad. That seems very straightforward to me. And I said I would address that. Yes. That assumes that you've measured either the pressure or the force. Right. And there's no teaching whatsoever on how to measure the pressure or the force. How to measure force? Do you think that it's necessary to measure force at a particular point? It would seem to me that's very easy to do. According to Ms. Nosheng and Mr. Hauser, it depends on at least three things. That is, where you measure it. That's the particular point. We know that. The distance or height that they're separated. Let's accept Mr. Kavanaugh's suggestion that the operation begins when the jaw is essentially closed, so the distance is going to be close to zero. Fine. That's what the specification says. I'll get to that. The specification only talks about closure. So we've dealt with two of those variables. What's the third? We really haven't. Well, I'm satisfied that the two are both out of the picture. So what have you got? What's your third? Because Ms. Nosheng admitted that the distance will depend on the thickness of the material in the jaw. That's one thing Mr. Kavanaugh conveniently overlooked, is even if you're talking about closure, the pressure and force will also vary dependent upon the tissue that's in the jaw. And since the specification talks universally about the tissue being blood vessels, I don't see how the fact that it would be different, pressure would be different if we were dealing with bone would make a difference. We don't deal with bone. Okay. And there's a great variance in the consistency of tissue that we are dealing with. In fact, Dr. Schaefer agreed that the tissue characteristics, such as compressibility, vary depending on the type of vessel the surgeon encounters. Blood vessels can be six millimeters, they can be half a millimeter, depending on the type of vessel you're dealing with. And the compressibility is different, and it depends, the pressure and force depends upon how much tissue you're actually compressing. It's not like a surgeon goes in there and can pick and choose, oh, I'll just clamp around this vessel. There's other stuff around it. Miscentery, for example, is a whole conglomeration of vessels. So it depends on how much tissue, how many blood vessels, and the size of those vessels are in that clamp. And both inventors testified that these measurements of pressure and force depend upon the tissue. And indeed, as Mr. Cavanaugh just recited, the pressures measured herein, or recited herein, are the pressures experienced by the tissue. And that's a conveniently overlooked factor. So there's where you measure it, and again, I say, it doesn't teach where you measure it, how far open it is, and that also depends on the type of tissue. Now, as to average… Are you saying that if the tissue is really thick… You're going to get higher pressures and forces because what you have to do is you have to clamp harder on the device. Then maybe you end up being just non-infringing. Then maybe you go outside the claim range. But the problem is if you have a device that it sometimes – and we, of course, think it's indefinite – but if you have a device that clamps on different tissues at different times, are we saying sometimes we infringe, sometimes we don't? We have a problem with marking the device. That's exactly the problem. It's frequently the case that one device can infringe in certain embodiments in certain instances and not in others. That's not – that wouldn't be shocking. And that doesn't cure the problem that we have, and that's why we're saying that the fact that this is indefinite and means it's invalid should not – we should not allow it. But as long as you know where the line is, then that solves the indefiniteness problem. But we don't know where the line is. Well, all right. I mean, when their own – first of all, when their own experts testify, there's at least three variables, where you measure, and there's variance. And she could not say which – there were four methods that they used at Epicon. The testimony is that we used four methods at Epicon, and the results vary. What are those methods? I know of a couple of them. There's a pin method. There's – I don't know all the methods because she didn't testify as to the methods. The point is that she said we used four different methods. They're not disclosed. And that's the problem. If there's four methods and she testified, we get different varied results, and here's the three factors that can change the measurement, then we don't know, reading the patent, how to get to those measurements. These are measurements of force? Is that what she's measuring? Yes, force. Right, and some of those methods were the jaw was partially open and not all the way closed. Is that right? But not open-open. In other words, depending on the tissue, you can have – when you say open, you can have – it's not really open. It's a certain degree of separation. Okay. It could be where it's open. It could be where it's closed. But depending on the mass of tissue that's in there and type of tissue, closing can have different degrees of separation of the jaw. Again, just simple. I'll put this much tissue in. To me, it's not going to close that far. But I thought I read the patent as saying that you take these measurements when the jaw is closed. No. The clamping arm is in very, very close proximity to the underlying blade. The patent only says two things on that point. The pressures disclosed herein are pressures seen by tissue when the entire clamping surface area is in contact with tissue. When you first contact tissue, you're not nearly closed. So it doesn't teach there that it's closed. It then says, as previously mentioned, a clamping surface area where the blade and tissue pad are in close – is the area where the blade and tissue pad are in close proximity when the clamping arm is in a closed position. That just defines – if you look at the blades on these things, they're curved, they bend, and you have to actually close it to see what the cross-section would be so that there would actually be mating. You can't tell just by having it open what would mate with the clamp. That only talks about the relationship of pressure equals force over surface area. So what is the surface area? The surface area is that much of the tissue pad that would actually come in contact with the blade if we closed it. That's defining the surface area. That's not defining when you measure. There's no talk about closure. And as far as average – first of all, as far as measuring the midpoint, the expert supported his opinion by nothing. There's no outside standard for measuring at the midpoint. None at all. He pointed to another patent – I think it's 874 or 974 patent. It's in his report. It talks about measuring at the midpoint. He admitted at deposition that there was nothing in that patent equating average with measuring at the midpoint. And indeed, that patent is not incorporated by reference or otherwise. Secondly, he admitted at his deposition that notwithstanding Mr. Kamenow saying it's a linear relationship, actually along the pad he admitted at deposition that along that pad it's actually hyperbolic. It's 1 over x. So it does vary greatly. It's not just minimal change along that pad. It's 1 over x. That's what he said at his deposition. And again, as I said, as far as average measurement, the claims call for not just average measurement. Every claim has separately either doesn't recite average or recites specific. For example, specific coaptation pressure. I'd like to turn to the design patents. The design patents cover three features. The u-shaped knob, which functionally is used to clamp the device. It covers the design of three features. Theoretically, that's what it's supposed to cover. I apologize. You're right. It shows the design of a u-shaped figure, which in the device is used to clamp functionally the device. The design of the torque knob, which in the device is used to turn the clamp to align it with tissue. The design of the rounded button, which in the device is used to power the device. It's interesting to note that at the same time, in fact, they all claim priority back to a utility patent application that has the exact same elements and recites the functionality of these elements. For example, they talk about the ergonomically designed u-shaped trigger providing access to fingers with the longer lever allowing more figures to provide greater pressure and the shorter lever to allow the operator to use the fingers to open the device. The shape and location of the button is described as enabling access to shorter fingers. The shape and placement of the torque knob as well as the number and size of the flutes allows finger operation. Just by example, as far as whether these design elements are dictated by function or not and therefore invalid, the u-shaped trigger handle, and this is all from Ethicon's testimony and documents, has a curvy device so it fits better in your hand. That's from Daniel Price, their lead design engineer. That's the curve. The open design provides easy access for the user. That's in their ad campaign. Mr. Winteringham, at the end of your time, you've gone over. Do you have any concluding comments on the design patent? I think that the point on the design patent is that putting aside invalidity, which I was just talking about functionality on, as I noted at the beginning, there's a very detailed analysis at A135 to 43 of why there's no infringement and why the court found they were sufficiently distinct. Ethicon says, well, a error is they didn't consider the prior art. Under the Egyptian case, you don't have to consider the prior art if you found that they're sufficiently distinct. Thank you very much. Thank you. Mr. Kavanaugh has a little rebuttal time if you want to take another minute, take four minutes. Thank you, Your Honor. Let me start again with 501 and indefiniteness. Mr. Winteringham is right. If you look at Figure 2, it is showing a very small tissue pad. It is somewhat longer in the accused product. What our expert did was— Well, it's not just the figure because the specification refers to that tissue pad as being very small. That's correct. It is, relatively speaking, all of these tissue pads are small in the accused product. But his point is correct. It's a little longer in the accused product here. And what our expert did was he took the midpoint of their tissue pad. Now, this issue of the thickness of the tissue is somewhat of a red herring, and the district court did rely on that. But if you take the measurement, as we believe the specification calls for, when the blade and the pad are in close proximity and the clamping arm is in the closed position, you're at the end of the cutting and sealing process. So whether you started with a thick vessel or a non-thick vessel, whether it was 1 millimeter, 3 millimeters— The patent only speaks about 1 to 3 millimeters, I believe. The measurement is going to come at the end of that process. You've already cut through the tissue. So you take that measurement at the end of that process. That's what the specification calls for. So the issue that there's great uncertainty created by virtue of the thickness of the tissue is essentially irrelevant, just as the measurements they were talking about when it's in an open position are irrelevant. Yes, Ethicon has lots of ways to measure, but not measure for purposes of the patent derived at an average to determine whether you're in the claim. As an operating business and a technology company, yes, they're very interested in what's the force at the far end, the far distal end, because that's where you go to grasp tissue sometimes. They have lots of issues. They're interested in what it looks like when it's open, but that has nothing to do with purposes of this claim. On the design patents, this court has set a very stringent standard. Are there alternative designs that can provide these functions? Our expert laid out alternative functions both with a U-shaped trigger and with a non-U-shaped trigger that can provide these basic functions and provide them comparably. They have a heavy burden of clear and convincing evidence with all inferences in our favor for them to get summary judgment on invalidity. Could you very briefly run through the four different methods that the representative discussed? I don't think she specified all four. I do know that some are when it's in the open position. I know she – I believe she mentioned the one that I just referred to that it's all the way at the end when they're interested in grasping tissue. But she did not relate any of those to the claim in an effort to determine an average when it's in a closed position. I believe I'm out of time. Well, I was giving you another minute. Oh, okay. So let me just say on the issue of infringement. Yes, perhaps you don't need to look at the prior art when you're looking at the difference between an apple and a banana. But when you look at their design, their use of a U-shape, their configuration of our U-shaped handle, where they put their activation button, where they put their knob, it is sufficiently similar that you need to look at it in the context of the prior art. You have one design patent that's just devoted to the open trigger, right? Correct. The U-shape. Do you think that that design patent encompasses all U-shaped triggers? No, Your Honor. It would not. It would cover the ornamental aspects of our U-shaped trigger. The relative distance between the proximal and distal end. Its orientation. All of those things are ornamental aspects, and under this court's precedent, those ornamental aspects would make it— The curves, the tapering, the pointing away. Are all things that this court needs to take into consideration when it looks at the validity of the claim. But it is also something that the district court would need to look at in evaluating infringement. But it would need to do so in the context of the prior art, which is very different. And they have adopted our look in comparison to the prior art, and that's why we believe there's infringement. Correct me if I'm wrong. The parties have waived jury trial in this case, is that correct? Yes. So if we were to reverse on the infringement, it would go back for a trial before the judge on the issue of infringement? That's correct, Your Honor. And the judge would look at the prior art and make a determination as to whether it was wrong in the first instance. Yes. I believe what this court needs to do is to advise the district court that it needs to look at this in the context of the prior art. Thank you, Mr. Cavanaugh. We'll take the case under review.